IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS      :    Consolidated Under
LIABILITY LITIGATION (No. VI) :    MDL DOCKET NO. 875
                              :
                              :
RICHARD ARCHER                :
                              :
                              :
        v.                    :    Civil Action No. 09-cv-70093
                              :
                              :
                              :    Transferred from the Northern
MEAD CORPORATION, ET AL.      :    District of Alabama

_____

ALFRED MCGUFFIE               :
                              :
                              :
        v.                    :    Civil Action No. 09-cv-70095
                              :
                              :
                              :    Transferred from the Northern
MEAD CORPORATION, ET AL.      :    District of Alabama

_____

REBEKKAH RIGGS                :
                              :
                              :
        v.                    :    Civil Action No. 09-cv-70094
                              :
                              :
                              :    Transferred from the Northern
MEAD CORPORATION, ET AL.      :    District of Alabama


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          July 28, 2011


        Before the Court is Defendant MW Custom Papers, LLC's

Motion for Summary Judgment in the above-captioned cases, and

1

Plaintiffs' Response.

I.    **BACKGROUND**

Plaintiffs in the instant cases have asserted claims based on alleged exposure to asbestos at the Cement Asbestos Products Company ("CAPCO") and National Cement plants in Ragland, Alabama.  It is undisputed that The Mead Corporation ("Mead") as Corporate predecessor to named Defendant MeadWestvaco Corporation, was a shareholder of the above-mentioned plants from 1963 to 1974.

CAPCO manufactured pipes that were a mix of asbestos, cement, and silica.  (Permit Appl. for Manufacturing or Processing, Pl.'s Ex. 10, doc. no. 118-12, at 8.)[1]  Raw asbestos was delivered in bags to the facilities, where it was mixed with cement and silica into a "slurry," and then rolled in to pipe form.  (Id.)  About 6,000 tons of asbestos were used per year in the manufacturing process at CAPCO.  (Id.)  There is testimony on record that the worksite was consistently very dusty.  (See Dep. of Ferrell Riggs, Oct. 17, 1997, doc. no. 118-46, pp. 51-52, testifying that he believes he was exposed to asbestos dust "everywhere" because he could see the dust everywhere in the plant.)

Plaintiffs originally filed the instant cases in

---

[1]    All citations to the record are from the Archer docket, 09-70093.

Alabama state court in 2005, following the diagnoses of various asbestos-related diseases.  The cases were removed individually based on federal question jurisdiction pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and transferred to the Eastern District of Pennsylvania as part of MDL 875 In Re: Asbestos on June 12, 2009. After discovery was completed, Mead moved for summary judgment in all three cases on identical legal grounds.  This memorandum explains the legal principles relevant to all three cases and applies them to each case.

This Court has supplemental jurisdiction over Plaintiffs' non-CERCLA state law claims pursuant to 28 U.S.C. § 1367.  Alabama law applies to the state-law claims at issue.  See Felder v. Casey, 487 U.S. 131, 151 ("Under Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), when a federal court exercises diversity or pendent jurisdiction over state-law claims, 'the outcome of the litigation should be substantially the same . . . as it would be if tried in federal court.'").

A.  Charles Archer's Work History

Plaintiff Charles Archer worked as a machinist at CAPCO from 1964 to 1976 and was then employed at National Cement from 1976 to 2002.

3

B.   <u>Farrell Riggs's Work History</u>

Plaintiff Farrell Riggs was employed as a laborer and operator at CAPCO from 1977 to 1982, when it closed.  He was responsible for cleaning up asbestos, including sweeping the floors.

C.   <u>Alfred McGuffie's Work History</u>

Plaintiff Alfred McGuffie was employed at CAPCO from 1968 to 1982, when it closed.  He was a laborer, clerk, and a labor foreman.  He was responsible for opening bags of asbestos, unloading them, and cleanup.

D.   <u>Plaintiffs' Claims Against Mead</u>

Plaintiffs are pursuing claims against Mead under four separate theories of liability.  First, that Mead voluntarily undertook a duty to provide a safe work environment at CAPCO and National Cement, and negligently failed to provide a safe work environment.  Second, that Mead negligently inspected the premises.  Third, that a division of Mead sold asbestos-containing gaskets to CAPCO.  Fourth, that Plaintiffs were exposed to an asbestos at a dumpsite owned and operated by Mead, where asbestos waste from CAPCO and National Cement was deposited.

## II.  DISCUSSION

As a threshold matter, Mead asserts that Plaintiffs' claims are time-barred.  Mead additionally asserts that the doctrine of shareholder immunity under Alabama law protects them from liability for injuries occurring at the worksites at issue.

### A.  Statute of Limitations

Under Alabama law, all claims for pre-1979 exposure to asbestos must be filed within one year of the last date of exposure.  For any exposure to asbestos after May 17, 1980, the claim accrues upon discovery of an asbestos-related disease. Garrett v. Raytheon Co., 368 So. 2d 516 (Ala. 1979); Johnson v. Garlock, Inc., 682 So. 2d 25 (Ala. 1996); Henderson v. MeadWestvaco Corp., 23 So. 3d 625, 629 (Ala. 2009); see also Corley, 10-61113, doc. no. 86.

Two facts regarding the statute of limitations defense are undisputed: (1) Plaintiffs have alleged exposure to asbestos at CAPCO and National Cement after 1979; (2) Mead sold all of its interest in CAPCO and National Cement in 1974, and there is no evidence of Mead's involvement with CAPCO or National Cement after 1974.

Mead argues that because it ceased all activity at these worksites in 1974, the pre-1979 "last exposure" rule applies.  Plaintiffs respond that because they can show post-1979

exposure to asbestos at these worksites, the discovery rule applies. The central question is whether the relevant date for statute of limitations purposes is the date on which the defendant's allegedly tortious activity occurred, or the date on which plaintiff suffered an injury and the claim accrued.

It is clear that the relevant date for statute of limitations purposes is the date of plaintiff's injury. The Alabama Supreme Court's decision in <u>Henderson</u>, 23 So. 3d 625, is instructive on this point. The <u>Henderson</u> case involved the same defendant (Mead), the same worksite (CAPCO), and the same theories of liability (duty to provide a safe worksite and negligent inspection) as the instant cases. Plaintiff worked at CAPCO during the summers of 1971 and 1972 while he was in college. <u>Id.</u> at 627. Plaintiff asserted that Mead had "voluntarily assumed a duty to inspect the CAPCO plant and to ensure compliance with safety standards." <u>Id.</u> at 628. The Alabama Supreme Court, however, found that Plaintiff's claims were time-barred, because "based on the law as it then existed, [Plaintiff]'s claim of personal injury resulting from exposure to asbestos would have accrued in 1972, on the date of his last exposure to asbestos at CAPCO." <u>Id.</u> at 630. Therefore, in <u>Henderson</u>, Plaintiff's claim was time-barred, based on the last date of exposure to asbestos.

The instant cases are distinguishable from <u>Henderson</u>,

because Plaintiffs here have raised at least a genuine issue of fact as to whether Plaintiffs were exposed to asbestos after 1979.  Plaintiff Farrell Riggs and Plaintiff Alfred McGuffie worked at CAPCO until it closed in 1982.  Plaintiff Charles Archer worked at National Cement until 2002.[2]  Under Alabama law, when a plaintiff shows post-1979 exposure to asbestos, his or her action does not "accrue" until the individual knew or should have known of an asbestos-related disease.  Ala. Code 1975 § 6-2-30 (1993).  As there is a genuine issue of material fact as to whether post-1979 exposure to asbestos occurred as alleged, Mead is not entitled to summary judgment on this ground.

The Court notes that Mead's lack of involvement at the worksites after 1974 may be relevant on the issue of proximate cause.  To be held liable under a negligent inspection theory, a plaintiff must show that a defendant (1) undertook inspections (2) did so negligently and (3) "that such negligence was the proximate cause of his injuries."  Glover v. Silent Hoist & Crane

---

[2] Both parties' moving papers focus on Mead's involvement at CAPCO, and do not provide as much information regarding Mead's involvement in the closely-related National Cement plant. However, as Mead has conceded that it had an ownership interest in National Cement and did not move for summary judgment specifically on its duty (or lack thereof) with respect to National Cement.  View the factual record in the light most favorable to Plaintiffs, as the Court must, the Court accepts for purposes of the motion that Plaintiffs' theories apply equally to CAPCO and National Cement.

<u>Co., Inc.</u>, 471 F. Supp. 457, 459 (N.D. Ala. 1979)(finding that insurer's safety recommendations were not the proximate cause of plaintiff's injuries).  A jury may determine that the significant gap in time between Mead's actions and Plaintiffs' injuries renders the causal relationship too attenuated.  However, Mead has not moved for summary judgment on proximate cause and, in any event, it is traditionally a question reserved for the jury under Alabama law.  <u>See</u>, <u>e.g</u>, <u>Mobile Gas Serv. Corp. v. Robinson</u>, 20 So. 3d 770 (Ala. 2009)("Ordinarily, it is a jury question whether consequences of an act are reasonably foreseeable . . . .").[3]


B.  <u>Grounds for Liability</u>


1.  <u>Sale of Asbestos-Containing Gaskets</u>

Mead additionally moves for summary judgment on Plaintiffs' claims that Mead sold asbestos-containing gaskets to CAPCO.  Mead has produced the testimony of Anthony Oliver, Vice President and Assistant Treasurer of MW Custom Papers LLC

_____

[3] Having decided that Plaintiffs' claims are not barred by the Alabama statute of limitations, the Court need not address Plaintiffs' alternative argument that the federal statute of limitations pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") governs their claims. Plaintiffs' claims regarding exposure to dumpsites under Alabama law is addressed below, II(B)(4).

(successor in interest to Mead) stating that, "MW is in possession of no documents or information that indicate that there was an asbestos component to any gaskets sold by Murray Rubber to CAPCO" and that a review of documents in possession revealed that the gaskets were made of rubber, and were not asbestos-containing.  (Decl. of Anthony Oliver, doc. no. 111, at ¶ 1, ¶ 17.)  Plaintiffs have produced invoices of gasket sales to CAPCO, but provide no evidence that the gaskets were asbestos-containing.  As Plaintiffs have failed to point to evidence of record that the gaskets at issue were asbestos-containing, Mead is entitled to summary judgment on this ground.

> 2.   Mead Voluntarily Undertook the Duty to Provide a
>      Safe Workplace

Plaintiffs' Complaint "alleges direct liability under Alabama Law for negligence in [Mead's] independent and voluntary assumption of duties over management supervision, safety concerns and safety inspections at the CAPCO facility."  (Pl.'s Resp. at 21.)

Mead responds that it was a "mere shareholder" of CAPCO, and that Alabama law prevents an imposition of liability under these circumstances.  Mead relies on the Supreme Court of Alabama's decision in In Re Birmingham Asbestos Litigation, wherein the court held that the corporate veil could not be

pierced to allow asbestos plaintiffs to hold parent corporations
liable for the acts of their subsidiaries.  619 So. 2d 1360 (Ala.
1993).  However, this argument misses the mark.  Plaintiff's
theory of liability in this case is not based solely on the
corporate relationship between Mead and CAPCO, but rather on
Mead's voluntary undertaking of a duty.  Such a voluntary
undertaking is unrelated to Mead's status as a shareholder.
Therefore, Mead's assertion of "shareholder immunity" is
misplaced, and does not preclude Plaintiffs' claims.

Under Alabama law, an employer's duty to provide a safe
workplace is generally nondelegable, although it has been
established that an employer can delegate the responsibility to
someone within the business such as "supervisory co-employees."
Procter & Gamble Co. v. Staples, 551 So. 2d 949, 952 (Ala. 1989).
Additionally, outside parties, such as separately incorporated
but related business entities, may have a duty to provide a safe
workplace if they exercise "control or custody" of the workplace.
Id. at 953. In Procter, the Court analyzed whether the parent
company defendant had exercised "custody and control" of the
premises of a separately incorporated, wholly owned facility.
Id. at 950.  The court found that it did not.  The evidence
regarding defendant's custody and control was that it assisted
the employer in setting up a safety program during the

10

construction of the plant, provided safety literature, implemented a "tracking system" to monitor safety programs, and provided a safety policy which the employer chose to adopt.  Id. at 953.  After the plant was opened, defendant answered a few safety-related questions and made two visits to the plants to discuss safety.  Id. at 953-54.  The Court found that this record was insufficient to find that defendant "undert[ook] to provide plaintiff's decedent a safe place to work."  Id. at 954.

In the instant cases, the record is clear that Mead had some level of oversight regarding safety issues at CAPCO.  In 1963, Woodward Corporation ("Woodward") and American Smelting and Refining Company ("Asarco") entered into an agreement for the creation of CAPCO.  Woodward was already in the pipe business, and wanted to "expand its manufacturing to include the production and sale of cement asbestos products, especially cement asbestos pipe."  (Pl.'s Ex. 3).  Asarco was to supply the asbestos, via its subsidiary Lake Asbestos of Quebec, Ltd.  (Id.)  The division of the ownership of the plant was 60% Woodward/40% Asarco.  (Id.)  The agreement provided that CAPCO "will be operated as a self-sufficient entity, the parties recognize that CAPCO can be operated with substantially greater economy and efficiency if Woodward will supply direct management supervision on a consultant basis, which it is willing to do . . . ."

11

(Id.)(emphasis added).  Generally, "the affairs of CAPCO will be under the general management of the board of directors of six individuals, of whom three will always be designated by Asarco." (Id.)

On November 30, 1968, Woodward and The Mead Corporation ("Mead") entered into a merger agreement, wherein Mead, as the surviving corporation, took over "all the rights, privileges, immunities, powers, franchises, and authority" of Woodward. (doc. no. 118-9, at 1.)

Both prior to and after the merger, Woodward, and then Mead, employed a Director of Safety, Stanley Mooney.  (Pl.'s Resp., doc. no. 11-2 at 7.)  Mooney performed safety inspections twice a month, would talk about any unsafe practices with employees, and would send a written report regarding his inspection.  Under these circumstances, it is apparent that there was a corporate relationship between CAPCO and Mead that involved safety consulting.  The central question before the Court is whether this consulting rose to the level of "custody or control" over safety at CAPCO.

This Court previously granted summary judgment in favor of Mead in the instant cases, finding that Mead's actions with respect to CAPCO did not rise to the level "control or custody" over the worksite to support a finding that Mead voluntarily

12

assumed the duty of providing a safe worksite at CAPCO.  <u>See</u>, 09-70093, doc. no. 41, at 10.  Plaintiffs had produced numerous pieces of correspondence between Mooney and various Woodward/Mead and CAPCO executives.  For example, on June 18, 1971, directed all divisions of the company to send monthly safety reports and inspection reports to Woodward, but emphasized that OSHA reports should just be kept on file.  (Pl.'s Ex. 20, doc. no. 118-22, at 1.)  Other correspondence included advice on OSHA compliance, and inquiries into general industrial hygiene measures being taken.

This Court noted that "Plaintiffs assume rather than explain why the documents [produced] actually created" a relationship of custody or control over CAPCO's operations.  However, this Court later granted Plaintiffs' Rule 60(b) Motion, vacating the grant of summary judgment, in light of Plaintiffs' pending motion to compel which was outstanding but had not been addressed at the time of the summary judgment decision.  Mead has now produced the requested documents, and the issue is again ripe for adjudication.

Plaintiffs' rely on three new exhibits that were not previously before the Court, as follows:

> (1) Agreement between Woodward and Asarco for the creation of CAPCO, discussed above.  (Pl.'s Ex. 3, doc. no. 118-5.)
>
> (2) Letter from Stanley Mooney, dated March 29, 1968, noting that the sand blasting done inside the

CAPCO facility was creating an "atmospheric condition that "could result in something serious later" for the men working at CAPCO and his recommendation that "action be taken to eliminate this condition as soon as possible." (Pl.'s Ex. 60, doc. no. 118-65, at 1.)  Attached is a follow-up letter, directing S.D. Weaver, General Manager of the plant and Vice President of CAPCO, to "come up with a proposal to separate this operation from the shop, giving adequate venting or collection to the exhaust from this operation." (Id. at 2.)

(3) Approval for Capital Expenditures memo regarding dust collectors for CAPCO. (Pl.'s Ex. 62, doc. no. 118-67, at 1.)  Plaintiffs contend that this speaks to the fact that "Mead financially controlled the ability to make improvement, such as repair or replacement of the dust collectors." (Pl.'s Resp., doc. no. 118-2, at 27.)

In 1974, Mead sold all of its interest is CAPCO and National Cement.  In addition to the unsatisfactory performance at the plant, Mead cited the "adverse development[]" of "asbestos related cancer publicity." (Mead Exec. Cmte. Meeting, Sept. 26, 1974, doc. no. 118-11, at 3.)

The evidence produced by Plaintiffs, even when viewed as a whole and in a light most favorable to them, fails to rise to the level at which a reasonable jury could find that Mead had "custody or control" of the work environment. The documents creating CAPCO envisioned Mead's role as a consultant, and the evidence presented is consistent with that vision.  As part owner of the plant, Mead periodically inquired as to specific safety concerns, and was involved in providing advice and guidance on

14

OSHA requirements.  In <u>Procter</u>, the defendant parent company clearly had a level of involvement at the worksite, and indeed created the safety program.  However, consulting about safety concerns does not rise to the level of undertaking the duty to provide a safe workplace.

In the instant cases, it is clear that CAPCO executives and employees retained custody and control of the worksite, and ultimately had the duty to provide a safe working environment. For example, when asked to name the individuals who promulgated departmental safety rules at CAPCO, S.D. Weaver, former Vice President and General Manager of the Plant from 1964 to 1967 named himself "Bill Jemison, Horace Beasley and Richard Creech." (Pl.'s Ex. No. 26, doc. no. 118-28, at ¶ 20.)  The policies and procedures did not come from Mooney or Woodward/Mead, but from CAPCO executives and employees.  Indeed, in Plaintiffs' newly-produced Exhibit 62, the response to Mead employee Mooney's concern was to direct S.D. Weaver to create a solution.

Therefore, Mead is entitled to summary judgment on Plaintiffs' claim that it had "custody or control" of CAPCO such that it had a duty to provide a safe workplace.

3.    <u>Mead Voluntarily Undertook a Duty to Inspect the Premises, and did so Negligently</u>

Plaintiffs additionally assert a theory of negligent

15

inspection, a separate and independent theory from the "custody or control" basis of liability.  See Procter (finding that the case was tried on separate theories of "allegedly negligent inspections" and "fail[ure] to provide plaintiff's decedent with a safe workplace"); see also Ramirez v. Ala. Power Co., 898 F. Supp. 1537 (M.D. Ala. 1995)(separately analyzing plaintiff's claims of "failure to provide a safe workplace" and "failure to perform safety inspections").

In Procter, one month prior to the incident, defendant conducted an audit of the plant, wherein its agent examined the compactor that eventually caused the injury and found no problem with it.  Id. at 955.  There was expert testimony to the effect that "anybody" familiar with that type of equipment would have recognized a dangerous condition.  Id.  Despite defendant's argument that it performed a general audit, the Court found that defendant had indeed performed a "safety inspection," and that the duty "once assumed, is one of inspecting and reporting."  Id. at 956 (internal citations omitted).  The Court found that the jury was properly instructed on the negligent inspection claim.

In the instant cases, the record reveals that Mead voluntarily undertook inspections of CAPCO, and there remains a genuine issue of material fact as to whether Mead did so negligently.

16

In answers to interrogatories from an unrelated case, S.D. Weaver, CAPCO Executive, stated the following regarding inspections of the CAPCO plant:

> During the time I was employed by Capco at its Ragland facility, the safety director of Woodward Iron, Dan Mooney [sic], would conduct a safety inspection of the facility twice per month. I would generally accompany him on his inspection. The inspection included all aspects of plant safety and housekeeping. If Mr. Mooney observed any unsafe work practice, he would discuss it with the employee. Mr. Mooney would then send a written report concerning his inspection. In addition, safety was always a concern to all management personnel. If any manager observed an unsafe work practice it would be pointed out and the employee would be told how to do what they were doing safely. I believe that OSHA inspectors and Alabama State inspectors visited the Ragland facility from time to time. (Pl.'s Ex. No. 26, at ¶ 13).

Plaintiffs have produced evidence that the decision to put off taking any dust counts at CAPCO was "discussed with Stan Mooney after a visual inspection tour." (Pl.'s Ex. 24, doc. no. 118-26, at 2, letter dated January 25, 1971.) In 1972, CAPCO reported to the Alabama Air Pollution Control Commission that 6,000 tons of asbestos were used each year in its manufacturing process. (Permit Appl. for Manufacturing or Processing, Pl.'s Ex. 10. doc. no. 118-12, at 8.) Plaintiff Ferrell Wade Riggs testified that, notwithstanding the presence of visible asbestos dust in the air, no breathing devices of any kind were issued,

and that he used "one little old cloth mask one time" at his own request, but that there was no standard respiratory protective gear issued or recommended.  (Dep. of Ferrell Wade Riggs, Oct. 17, 1997, 40:14-16; 41:5-7, doc. no. 118-46.)  On the factual record presented, there is at least a genuine issue of material fact as to whether Mead undertook to inspect the worksite, performed the inspections negligently and that such inspections were the proximate cause of Plaintiffs' asbestos-related injuries.  Glover v. Silent Hoist & Crane Co., Inc., 471 F. Supp. 457, 459 (N.D. Ala. 1979).

### 4.  Exposure at Dumpsites

Plaintiffs additionally allege that Mead is liable for injuries caused by exposure to asbestos at Mead's owned and operated dumpsite.

Mr. Archer testified that after he left CAPCO he "went around the area up there outside the plant where the dump and everything is.  I quail hunted and I quail hunted a lot up in there and we – we shot some doves up in there.  They had a dove shoot."  (Dep. of Charles Archer, Nov. 17, 2003, doc. no. 118-47, at 5.)  Plaintiff Iris McGuffie, wife of Alfred McGuffie, testified that she and her husband would "take limbs cut from our trees to the CAPCO dumpsite."  (Aff. of Iris McGuffie, Apr. 4,

2011, doc. no. 118-52.)

      This testimony evinces a minimal level of contact with the CAPCO dumpsite.  From this evidence, no reasonable jury could find that exposure to asbestos dust at the CAPCO dumpsite was a substantial contributing factor to Plaintiffs' asbestos-related injuries, as required by Alabama law.  <u>Blackston v. Shook & Fletcher Insulation Co.</u>, 764 F.2d 1480, 1481 (11th Cir. 1985).

## III. CONCLUSION

      Based on the foregoing, Plaintiffs' claims are not time-barred, as they have presented evidence that may show post-1979 exposure.  However, Mead is entitled to summary judgment on all of Plaintiffs' claims except that Mead voluntarily undertook a duty to inspect the premises, and did so negligently.